Good morning, Your Honors. David Ross on behalf of the Petitioner. We have two attorneys here today, Lewis Gordon and myself. I will be arguing the issue of changed circumstances. Mr. Gordon will be arguing the issues concerning the habeas. We also will be reserving two minutes for rebuttal time. With regard to- You only got ten minutes. That's what it says over there. I understand. All right. Thank you, Your Honor. Got your track shoes on. Okay. I'm a fast talker. Listen, this is an important case, so go ahead. Thank you very much. The crux of this case turns on changed circumstances. What I found incredibly informative today was listening to the Attorney General of the United States tell Congress this morning that the situation in Iran is so bad that new legislation has to be passed. When we talk about changed circumstances, this is something that we have to look at on a continuous basis. That's why Malti is so important in this case. When this Court decided Malti, it specifically found that just because it's the same situation with regard to the government in power doesn't mean that you can't have changed circumstances because of the intensity of what has happened. And that is exactly what has transpired in this case. We have an individual who has converted to Christianity. He was a Muslim. He is now asked to return to a country that has only recently elected the most radical president in the history of this country, Mr. Ahmadinejad. The government of the United States has called this country an axis of evil. Potentially, we may even have an attack on nuclear facilities. And the government presupposes to say that there is no sufficient changed circumstance to justify granting this person, at the very minimum — Counsel, you're surely not suggesting that the question of Iran's nuclear capability is somehow related to your client, though. Technically, it is because it shows the intensity of what is transpiring, what they're willing to do. I mean, if we're looking at a country that's willing to kill hundreds of thousands of people, what's killing one person mean? Nothing. And, in fact, it has a history more recently of torturing and killing anybody that it doesn't like. There is no due process in Iran. There isn't a person alive today except perhaps — And the situation is different than, for example, when we had Ayatollah Khomeini? Much more different. In the last five years, five years ago, the president of Iran, Mr. Mohammad Khatami, was actually considered to be a more moderate person, and people thought there was going to be a change in the government. But in the last two years, and especially this year, Ahmadinejad has recently come out and said the Holocaust has not occurred. We're going to bomb Israel. The United States is the most horrific, terrible country in the world, and we'll do everything we can to stop American imperialism. And this has only happened in the last couple of weeks. You just have to pick up a newspaper and see this, how extreme the country has become. If that has not changed circumstances — What's the timing in terms of your argument? Assuming that I were to go along with you and say that it was bad before and it's worse now, what's the relevant time of the changed circumstances in Iran for purposes of the case now in front of us? What the circumstances are today, or the circumstances when the BIA made its decision that the changed circumstances weren't enough? That is a point that is well taken. When the BIA made its decision, the circumstances had already begun to change. The machine was in motion. But the BIA refused to recognize that. That's why Malti is so important, because what Malti really says is, you look at the continuity of what is happening, and you see that there is an evolution, a metamorphosis. You don't look at something at a particular point in time. You look at it as it evolves. And that's what happened in Malti. Malti was a Coptic Christian. The BIA said, well, we know Coptic Christians have problems. But the court here said, yes, but now it's worse for Coptic Christians. Isn't that a problem with your case on this point? I emphasize on this point, that the most important changed circumstances is, of course, the conversion to Christianity. That if he had not converted to Christianity, the claim he has now of a fear of death simply wouldn't exist. What do I do with that, given that it was his change that's at least as important to the consequence he fears than any change in Iran? Five years ago, that probably would have been a better argument. But today, anybody who has lived in the United States has become so westernized, has developed the mores and character that is essential to this country's function. Those people are now ostracized and put in a situation of such great suspicion in Iran that even people who have not converted, just regular... You're suggesting that his mere presence in the United States, then, is the circumstance  The westernization. I mean, we're arguing the apostasy as well, but we're also arguing the westernization, because what has happened is... But the westernization is a change in him. But it's a change in Iran, especially in the last two years. He fled Iran and went to Britain. That's correct. There was a reason for him to leave Iran in the first place. Period of uncertainty, Your Honor. In 1989, actually, he went to Iran earlier, before the situation was so bad. He actually went to England to study. I think the record will show that. He did not flee Iran. He went to England to study. And for that reason, he really didn't have in his mind at that time. He was a very young man when he went to England. And just so we understand, he never received any residency in England, because that always has been an issue. Well, let me ask you this. Is there an order of removal that's been filed in this case? There has not been an order of removal. It was an exclusion... Don't we need an order of removal before we have jurisdiction? It was an alternative order that if he failed to depart, because there was an exclusion proceeding, and he was ordered to leave the United States within a certain time, and if he failed to depart, there was an alternative order. So in that sense, there is an order. Well, it was a failure to depart by the date set by the director, the district director. No date was ever set. So he's not in violation, technically, of any order by the I.J., the 1990 order. Well, the government has argued that there should be no stay of removal, and this court initially... or wrote to the British consul general here that they'd lost his Iranian passport, they lost his visa that he got from England, and that he would be...he would depart the country when he got those documents back, and they agreed to that. It's in the letter, right? He's never gotten them back. Is that right? That is correct, Your Honor. All right. So he's still here, rightfully. Your Honor, you asked about jurisdiction. With regard to jurisdiction, we have a final BIA decision, which is why we're here today. I'm asking you all kinds of questions, so don't try weaving one in with the other. It's not going to get you anywhere. But... Per se, I have not seen a final order of removal or deportation, because the way the judge crafted it in the exclusion proceeding was that she said, if you fail to depart foreign within a time set which is correct, there will be an alternate order of exclusion. And I have not seen that order. Has he ever had an opportunity to actually apply for political asylum or cancellation of removal on the merits of his matter? No. All right. Well, you're already into surplus territory by 1 minute and 30 seconds, so we'll hear from you. Thank you very much. May it please the Court, Louis Gordon for Carlin and Carlin. Our client is essentially a man without a country, and he's never had the opportunity to apply for anything. And because of the INS now, DHS's negligence, he's unable to leave the But let me ask you this. Why did he surrender his passport? When, I believe, as part of the change of venue, his case started out in Boston, that should have been a requirement. This is a, you're telling me that the Federal Government required that he turn over the passport? It's usually a procedure in these proceedings whereby they take your passport to ensure your appearance at a hearing. Okay. And do we have any evidence as to how it might have been, if the word is even lost? I mean, was it thrown away? Was it eaten by a dog? I mean, do we know? We, the best evidence that we have is what's in the excerpt of records. Do we know how many, what percentage of files in the hands of the INS are lost? I don't have quantitative. It's a pretty big number, you know. I understand that. What do we know about, I mean, I've read representations of this, but I'm trying to figure out what do we know and how do we know it? His status in Britain, in Great Britain, had his passport been timely returned? I mean, I read that he was going to be entitled to some sort of permanent residency in Great Britain. Is that in dispute, that he would have been entitled to that? I don't believe it's in dispute. I believe it's very similar to what goes on here if you stay outside the country for a certain period of time. And by staying outside the country, he lost his rights to British residency. And the Iranian council here refused to give him another passport. That's correct. And the British council general refused to give him another visa. That's correct. So he couldn't go back to Iran because he didn't have his passport. He couldn't go back to England because they wouldn't give him a visa. But he was a legal resident of Great Britain before he came here. He had legal status in Great Britain. Legal status. Yes. And he was on his way for British citizenship. Well, that's speculative as to what would have happened. I thought I had that here, that he applied for it and maybe I'm... But he would not have in any event... He lost that opportunity. He lost that opportunity. And I did want to point out that he now has sole custody of a seven-year-old U.S. citizen daughter, and that we believe that were this court to order a notice to appear to be issued in his case, he could then have a hearing on cancellation of removal and asylum, and the DHS would have the opportunity to cross-examine him on... But, you know, if there was a due process violation in the initial proceeding in which his passport is, and I'm assuming that this is right, the government can say yes or no, he was required as part of that process to turn over his passport. He didn't do it just because, here, you're a better custodian than I am. They required him to do it. If there's a due process violation and they're requiring him to hand it over, and then to his substantial detriment, they refuse or fail to hand it back to him, that's a pretty lousy remedy for a due process violation that he gets to apply for cancellation or removal under the current standard. He may well fail that. That is to say, the extraordinary and unusual hardship necessary to show for cancellation or removal, I think it may well take more than merely showing that he's a custodian of an English-speaking daughter. I mean, we have no opposition to a better remedy. We're looking for a remedy at this point because he has none. Counsel, I'm still a little puzzled here as to why you filed a petition for habeas corpus. When he is not under any order and he's not in custody. Was this an effort to try and force the government to do something? And it's curious that you're trying to force the government to do something because, of course, you're drawing attention to a client who isn't under any order to leave the United States. He's seeking a solution to this issue, Your Honor. And there's we don't know of any other legal remedy to solve this problem. That's why we've I realize this question is going to be a little bit outside the record. Have you tried seeking, for example, a private bill? Has he been through any political attempts? My understanding is that he has looked into private bills, but the congressman in question does not want to do anything until this Court rules. The congresswoman, not a congressman in Long Beach. And I think if you talked to her, she'd put in a private bill. I don't know, you know. Seems like a very, very nice person. Maybe write to the Catholic Church. They've abolished limbo. They might have some ideas. I'm teasing. Okay. I understand. But that's why we saw habeas corpus, simply because he was trying to get a solution. If we were to grant a writ of habeas corpus, though, there isn't anybody to give the writ to, is there? There isn't anybody who's got the body. He's walking free. Well, he's in some type of constructive custody. There's a restraint on his liberty. He may not be in the physical custody of He's free to move about the United States at will. He's not free to leave the country. Well, that's a restraint on his liberty. But also, I believe that DHS has argued that he's violated his order. But they haven't issued an order telling him to leave. No. Were you hoping to precipitate that kind of an order by filing the writ of habeas corpus here? You're certainly going to attract some attention to him. I'm trying to figure out why you did this. We simply are trying to get a solution for him. Well, you know, sometimes what you wish for, after you get it, you're not so sure you want it. But I read that somewhere. Well, when he turned his passport over to the authorities, was it at the request of the INS? That's my understanding, Your Honor. Is it somewhere in the record where they're in court and the government lawyer says, Well, he wants to go to California and all this and that. And we think he ought to be required to. Because that's a common request, to turn over your passport. Is there anything in the record on that? I'm not aware of it, Your Honor, but also a large part of his record has been lost. Would that include the transcript? Well, he wasn't before a district judge in Boston, was he? No, it would have been immigration. Just an immigration matter. Okay. Thanks. Thank you. Good morning, Your Honors. Ann Varnon for the Respondent. May it please the Court. The Petitioner was given a hearing in 1990. He declined to seek asylum at that time. He has now filed, he was ordered removed. It's an automatic thing when a Petitioner does not leave the country that the, that when an alternate order of removal is entered, it becomes, it is automatic. Of course, in this case, it was an order of exclusion. Now, the Petitioner has had. We have a copy of that order. Yes, it's in the record, Your Honor. Where? It is in the record of the immigration judge. I don't have the exact page. There's a one-page order of the immigration judge. And you will see. What? It's 000104, a different record that I have. Well, in the, in the administrative record, it's at page 221. And you will see at page 221 that the judge did not designate a country of removal. And throughout these proceedings, it does not appear that the Petitioner has ever requested a change or a designation of a country. And so what happens in that case? Where does he go? Well, at section 241 of the Act, in conjunction with our agreements with countries around the world, you will see under 241B that there are specific provisions and when a Petitioner comes to the United States from another country, assuming that he did come from England, and I'm not sure that that's absolutely positive, but assuming that he did come to England and fly into this country. And why aren't you sure that it's, quote, absolutely positive, close quote, that he came from England? It appears that he did. But you say you're not sure that that's so. Why? What gives you pause? I really don't. I'm not trying to make a big point by that. It just appears that he came from England, and therefore — Do you dispute that he came from England? No. Okay. We do not. Okay. And it would appear, then, that England could take him back. But England won't take him back. Well, what proof do we have in the record of that, Your Honor? We have the letter. It has never been shown. No, we have the letter. Reginald Holloway, Consul General, British Consulate, you know, on Wilshire Boulevard in L.A., July the 18th, 1990. And it states here in the third paragraph, it says, on May 31, 1990, Mr. Vaddotti was prepared to depart the United States and attempted to retrieve his passport from the Immigration and Naturalization Service. At that time, the service was unable to locate his administrative file or his passport. His voluntary departure time was extended until such time that the service was able to locate his file and or his passport. Okay. Yes. That was in 1990, Your Honor. Yeah, and we still haven't found his file or his passport. The situation certainly hasn't gotten any better, has it? I mean, his status in England hasn't improved over the last 16 years, has it? England should take him back. Well, that would be really nice if we could compel England to do that, but I don't think we're going to issue a writ of mandamus to do that. Let me ask you this. Why did he hand over his passport? I do not know, Your Honor. Is it customary that he would be in this circumstance required to hand over his passport? I do not know. Why don't you know that? I simply do not know. Isn't this your business? Yes, it is. What is the custom then? What is the custom then? You heard what opposing counsel said, but I do not know whether the INS asked him to hand over his passport. I assume that it did, but I don't know. I'm assuming so, too, and I'm asking you what is the custom, and are you telling me you don't know what the custom is? No, I do not. I can look into it and inform the court, and I will do that if you would like. What percentage of files in the hands of the INS are lost? I don't know, Your Honor. Quite a few. Quite a few. I have no idea. I have had cases in which files have been lost. No, it's not uncommon. It causes great chagrin. It's not uncommon. Isn't that right? Well, that's true. It's not uncommon. I didn't hear your answer. Is that true? No, it's not. I would say that it is, in my experience, since 1996, I've been working for the Office of Immigration Litigation, and I would say that in my experience, it is uncommon, but it does certainly happen. Let me say this, so then it is not uncommon. Okay. Do you agree with that statement? It's not uncommon. I mean, I know it. I mean, I can almost take judicial notice, just from my experience, that files in the INS, you just walk in the office, they're just stacked in the hallways, and sometimes they discover asbestos, right? Then they move them, you know, two or three hundred miles away, and nobody knows where they are. They sent a lot of files to Boston and up in New England because of asbestos problems. Did you know that? No, I was not aware of that. Let me ask you this. That may be there. Maybe we'd better check in that asbestos room. Let me ask you this, and perhaps say this. My law clerk looked, and I confess I do not know independently of any case directly comparable to this one in the sense of decided case law, where, and I'm assuming that this is right, and you so far don't appear to have any information to dispute it. I assume that he did not voluntarily turn over the passport saying you're a better custodian than I am. I think we can safely assume that. I assume that the INS said in order to continue with these proceedings, please give us your passport. That is to say that he was required to hand it over. As a result of their having lost it, he has suffered, it appears to us from the record we have in front of us, a substantial hardship because he's no longer able to return to Great Britain to the status he enjoyed there. That strikes me as not only wrong. I can't find a case on point, but perhaps this maybe is going to be the case. That strikes me as a violation of due process. And if it is a violation of constitutional due process, what then? Your Honor, I would disagree that it does not constitute a violation of due process. Assuming it is. That was the question. Assume it is, then what? Assuming that it is. There are time limitations even on constitutional claims, Your Honor. That occurred presumably in 1990. You know, this strikes me as if this is the way we do justice in this country, there's something seriously wrong here. I mean, as far as I can tell, what the INS and the government as a whole would prefer to do is to forget that this man exists. That is to say, they do not appear to have any active effort to remove him. You seem rather embarrassed that he's brought these proceedings to try and adjust his status to get some form of regularity. You say, well, Great Britain should take him back. Well, Great Britain has no obligation to and seems not to have any desire to. I mean, you would prefer that he died. Well, at this point, the INS does not appear to have sought travel papers for this particular petitioner. And there is a — there are numerous cases that might be considered more important than this one in terms of looking into that. Okay. But then it seems — But our view is that he should be able to go back to England. We should be able to arrange for him to go back to England because — Well, the British have refused. They've refused. They have refused. They were asked. They said no. That's where we are. But apparently one person 14 years ago refused. That's the consul general of the British Empire here. He said no. Counsel, it's the only thing we have in the record is a refusal from Great Britain to take him back. Now, you know, if the United States wishes to negotiate something, we want to have our State Department talk to their foreign secretary in trying to arrange something, then perhaps you could do that. But I haven't seen any efforts in the record that suggest that we've done anything other than get a letter from the consul general saying we will not take him back, and that's the last thing that our government has obtained. Now, in answer to Judge Fletcher's question about due process, you told him that there are even time limits even on due process questions. But at the same time, counsel, there was no actual departure date ever given to him. He has been nothing but neglected since 1990. It's hard to fault him when he's not under an order for failing to come forward to do something. And as you can tell from the question that I posed to opposing counsel, I'm puzzled as to why they filed a habeas corpus claim here when you don't have the body, literally. There's nobody that is the custodian of this body to release it if we were to order such a writ to be issued. But it does appear to be a cry for regularization. That is a cry for help here. So what does the government intend to do? Well, I can't say what the government intends to do, but we do have two motions to reopen to seek asylum. And the petitioner is seeking a form of relief and a motion to reopen that it's not fair. It's two bites at the apple, and he's not entitled. As far as the due process is concerned, due process normally goes, and as far as I know, always goes to the hearing and whether the hearing was fundamentally fair. Well, there's a general principle of due process. If there's been a constitutional due process violation that the court tries to put the person here, the petitioner, back as near as may be in the situation he was before the violation, I think it's impossible to put him back in precisely that situation because the situation that then existed was he had the right to go back to Great Britain, which he seems now not to have. But the court has some equitable power to try and put him back in a position as near as may be. You know, you may get some bad law out of this case, or I'll say it this way. Or it may be good law. You may get some really good law that you don't like very much. The problem, counsel, as I see it, is this is a situation that you do not have rules that you are prepared to deal with. Well, we do have Section 241B of the Act. What rules counsel deal with a situation where you take a passport from somebody coming into the United States and then lose it? You don't have any kind of rules that would address this kind of situation, do you? Under 241, we remove people every day who do not have any kind of papers whatsoever. And where do you send them? To the country from which they came. No, from the country from which they came. And when the country from which they came won't take them because they don't have papers, then what? Then the Attorney General has several options under Section 241.  And what are the Attorney General's options under 241? Under 241B1C, if the country is unwilling to accept the alien into that country's territory, the Attorney General could return the alien to the country of which the alien is a citizen, subject or national. I thought that Iran had already indicated they wouldn't take him back. That is in the record, Your Honor. The country in which the alien was born, the country in which the alien has a residence. And if the answer to all of that is either England or Iran and no other country, and either of those countries will take him, then what? As I said at the outset, he is not requested a designation or a change in designation. Under 4, a country with a government that will accept the alien into the country's territory. If removal to each country described in a previous clause of this subparagraph is impractical, inadvisable, or impossible. Does Mr. Vidauti have any discretionary remedies still with the Attorney General? Is there anything that Mr. Vidauti can ask in the form of discretionary relief from the Attorney General? He has sought the motions to reopen to apply for asylum. Right, which are told us are not available to him. So does he have anything else that he can apply for? No, Your Honor. He said in 1990 at his hearing that he wanted to withdraw his request for admission into this country, and he did so. Which, right. But presumably so that he would then return to England, which you have now frustrated. So, I mean, this whole thing is circular, counsel. How are we going to break out of this? We're caught in a loop. And there isn't any good way out of it. That was before, you know, he got married. He had this little girl. He opened a restaurant in Long Beach, attended by all the prominent people there. And he's considered to be a leading citizen of Long Beach. And maybe the answer is that Long Beach ought to secede. He withdraws his request to file a petition for asylum at a time when he still thinks that the government has his passport and can return it to him. And that is not the case. Well, as I said, Your Honor, if the service is interested in removing the alien, there are ways that it can be done without any kind of papers. And I do not agree that the loss of the passport is a violation of due process. Now, Counsel, you prefaced your comment to me just now by saying if the service is interested in removing him. So let's ask the question, is the service interested in removing Mr. Vidotti? I cannot answer that question. I know that they have numerous cases and priorities within those. And apparently he would have been removed previously. But he had not. But I can't release him. Before you come here, don't you talk to somebody in there that, you know, going to be before these Ninth Circuit judges? You know who they are. No, Your Honor. They're going to ask us these questions, and what do you want me to tell them? Your Honor, our job is to defend the Board's decision. I would say more broadly, your job is to represent your client. Yes. Which may include, of course, defending the Board's decision. But ordinarily, you ask a client, okay, where are we with this? We have not done that in this case. He was ordered his first case before this Court was settled in 2003, and he has not been asked to appear. It appears to me, and I said this before, that as far as I can tell, the government would prefer to pretend that this man does not exist, and that from indications so far, they would prefer to allow him to live out his natural life running a restaurant in Long Beach without any papers whatsoever in a permanent state, or a state so long as he lives, in a state of limbo. Is that basically what we're looking at, if you get what you want? No, your Honor. I can't say that. What are we looking at, then? I would say that if we get what we want, which we should, in that this individual has had two motions to reopen based on asylum. But as I said, the service has many people who are in the United States under orders of removal, and due to their limited resources, they don't always get to those as quickly as we would like. So it's a little worse than they're going to let him live out his natural life in this country without any papers. He's going to live out as long of his natural life until the INS, in its discretion, decides one of these days to knock on his door. So he's always looking over his shoulder. Yes, Your Honor. That would be true. Is that what America's all about? Are you asking for my personal view? No, I'm just talking to myself. Okay. But... Okay, I guess that's it, huh? Thank you. All right. I think we've heard enough on this case. We have a pretty good handle on it. Unless there's any other questions. Let's see. Oh, yeah. You know, one of the things we've done with some degree of success in cases like this, we suggest that the parties meet with our mediation people in San Francisco, and they can also send someone down here and see what can be worked out. Any problem with that? Not to everybody, Your Honor. Not in this case. I must say I would have some pleasure if it were to work out, but some disappointment because there's an opinion I'm looking forward to writing. And I'm looking forward to concurring it. I think the government would be well advised here to go to our mediation unit, see if you can't work this one out. I know that you don't have any rules for this, and that's exactly I think a good time for the government to realize when it's time to compromise when you don't have rules that clearly apply to a situation like this. You might take that message back to people in Washington. Yeah. This would be a wonderful program for 60 minutes, wouldn't it? Or, you know, we could take the matter off calendar until this little girl becomes 21, then she could petition for her father's citizenship. Actually, Your Honor, the service has taken a position that he would not be eligible for adjustment of status. That is the unfortunate thing because they're taking the position that because there was a final decision, he would not be eligible for adjustment of status unless there was a reopening of proceedings. That's good. It's like a catch-22. Well, this will be the subject of my next novel. I think the idea of the mediation is very good, and I will talk with counsel. All right. We'll issue an order. Thank you, Your Honor. All right.
judges: Pregerson, W. Fletcher, Bybee